FILED
2024 Mar-27  PM 01:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| LIONAL SHON DILLARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:23-cv-00212-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Lional Shon Dillard filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits. Doc. 1. Plaintiff Dillard applied for disability benefits with an alleged onset date of September 26, 2019.[1] Doc. 7-4 at 2; Doc. 7-3 at 38. The Commissioner denied Dillard's claim for benefits. Doc. 7-3 at 2–6, 16–28. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 15; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and

---

[1] Dillard initially alleged an onset date of September 1, 2017 (Doc. 7-4 at 2), but later amended his onset date to September 26, 2019 (Doc. 7-3 at 38).

the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Dillard argues that the court should reverse the Commissioner's decision for four reasons: (1) the Administrative Law Judge (ALJ) "committed reversible error by improperly rejecting the opinion of Mr. Dillard's treating physician, Maria Prelipcean"; (2) the Appeals Council "committed reversible error by failing to accept additional evidence from Mr. Dillard's treating surgeon, Kimberly Vinson"; (3) "the ALJ committed reversible error by improperly rejecting" Dillard's testimony "regarding his subjective symptoms"; and (4) "the ALJ committed reversible error by making an RFC determination without fully and fairly developing the record." Doc. 10 at 5.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505.

A physical or mental impairment is "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)   if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)   if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to

demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs.  *Id.*  So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant.  *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

A.     With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of*

*Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

5

## BACKGROUND

### A.    Dillard's personal and medical history

Dillard was born on October 25, 1968.  Doc. 7-7 at 33.

The administrative record contains medical records of Dillard's appointments with his primary care physician, Dr. Michael Han, beginning in 2013.  Doc. 7-14 at 58.  His records from Dr. Han from 2013 to 2016 show developing thyroid issues and some recurrent bouts of pneumonia, but no other major problems.  Doc. 7-14 at 35–62.

In 2016, Dillard underwent a parathyroidectomy to address hyperparathyroidism.  Doc. 7-15 at 13.  At the time, he was under the care of Dr. Han and endocrinologist, Dr. Maria Prelipcean.  Doc. 7-15 at 20.  At the time of his surgery, Dillard reported "some difficulty with dyspnea [shortness of breath] on exertion."  Doc. 7-15 at 24.

On September 5, 2017, Dillard saw Dr. Han for an annual physical.  Doc. 7-14 at 29.  His exam was generally normal; he had a higher than normal body mass index (BMI) and was instructed to follow an exercise regimen and low calorie diet.  Doc. 7-14 at 29–31.

On September 6, 2018, Dillard saw Dr. Han for an annual exam.  Doc. 7-14 at 24.  Dillard had a history of high cholesterol and was on a diet.  Doc. 7-14 at 24.  He also had a multinodular goiter that was being followed by Dr. Prelipcean and for

which a thyroidectomy was recommended.   Doc. 7-14 at 24.   Dillard was prehypertensive and reported fatigue.  Doc. 7-14 at 24.  His BMI was above normal and he was instructed to follow an exercise program and a low calorie diet.  Doc. 7-14 at 26.  His history of hyperparathyroidism was listed as stable.  Doc. 7-14 at 26.

On October 30, 2018, Dillard underwent a total thyroidectomy at St. Vincent's Hospital on the recommendation of Dr. Prelipcean.  Doc. 7-8 at 49–55.

On September 12, 2019, Dillard saw Dr. Han for an annual exam.  Doc. 7-14 at 19.  Dillard had vocal cord paralysis after his thyroidectomy and had consulted with specialists about surgical options; one ENT (ear nose and throat) surgeon had already recommended surgery.  Doc. 7-14 at 19.  Dillard reported fatigue but no dyspnea.  Doc. 7-14 at 19–20.  An ENMT (ear, nose, mouth, and throat) exam was normal.  Doc. 7-14 at 20.  He had an above normal BMI and was encouraged to exercise and diet.  Doc. 7-14 at 21.

On September 26, 2019, Dillard saw Dr. Kimberly Vinson at the Vanderbilt Voice Center at the Vanderbilt University Medical Center with complaints of trouble breathing and speaking since his 2018 thyroidectomy; he was referred to Dr. Vinson by his endocrinologist, Dr. Prelipcean.  Doc. 7-11 at 48–49.  He was diagnosed with stenosis of the larynx, paralysis of the right vocal folds, and paresis of the left vocal folds.  Doc. 7-11 at 48.  Dr. Vinson noted that Dillard had a change of voice after his thyroid surgery and noted that he was "unable to move around as he did prior to

thyroidectomy due to respiratory distress," and that he had to stop and catch his breath after walking even short distances.  Doc. 7-11 at 49.  Dillard stated that his voice was raspy, but his biggest complaint was trouble breathing at rest that was even worse with exertion.  Doc. 7-11 at 50.  Dillard stated that he was unable to do any work around the house or walk a block without having to stop; he said he had been in good health with no limitation prior to his thyroidectomy.  Doc. 7-11 at 50.  Upon examination, Dillard was breathing well but had inspiratory stridor (high pitched breathing) with tracheal tugging.  Doc. 7-11 at 50.  An external ENMT examination was normal.  Doc. 7-11 at 50.  A scope of Dillard's throat showed immobile right vocal folds and minimal abduction in the left vocal folds.  Doc. 7-11 at 50.  Dr. Vinson presented Dillard with treatment options, including surgical cordotomy or tracheotomy (which would "certainly improve his airway"), and Dillard said he would contact Dr. Vinson if he wanted to proceed with any of the surgical options.  Doc. 7-11 at 52.

On November 25, 2019, Dillard underwent an elective right cordotomy performed by Dr. Vinson to address his difficulty breathing.  Doc. 7-10 at 32–39, 62–63.

On December 2, 2019, Dillard presented to the emergency department at St. Vincent's Hospital with shortness of breath and difficulty breathing.  Doc. 7-8 at 10–11.  He had undergone his cordotomy one week prior and his breathing had improved

at first but then worsened.  Doc. 7-8 at 11.  He had throat pain with breathing stridor and his breathing difficulty remained the same whether he was sitting or lying down. Doc. 7-8 at 11.  An ENMT examination was normal.  Doc. 7-8 at 13.  After ENT evaluations by two doctors, Dr. Simpson and Dr. Black, Dillard was found to have edema in his throat and was given racemic epinephrine and steroid treatment; he was admitted to the intensive care unit for close airway monitoring.  Doc. 7-8 at 15. Dillard was diagnosed with bilateral cord paralysis with postoperative worsening airway obstruction.  Doc. 7-8 at 16.  On December 3, 2019, Dillard was reported to have reduced edema and to have done okay overnight with improved breathing. Doc. 7-8 at 44.  He was discharged with a steroid prescription.  Doc. 7-8 at 44.

On December 5, 2019, Dillard saw Dr. Vinson for a follow-up appointment. Doc. 7-9 at 9.  Since his release from the emergency department, Dillard felt that his breathing was "stable or slightly better than before surgery."  Doc. 7-9 at 9.  He was having some trouble with a feeling of dryness in his throat and using his CPAP.  Doc. 7-9 at 9.  Dillard had severe roughness of voice and mild turbulent breathing, but was breathing "well" with mild audible breathing with deep inspiration and no other breathing issues.  Doc. 7-9 at 9.  An external ENMT exam was normal.  Doc. 7-9 at 9.  Dr. Vinson scoped Dillard's throat and found bilateral vocal cord paralysis, some granulation tissue at the surgical site, and limited glottic airway.  Doc. 7-9 at 10.

On December 18, 2019, Dillard saw Dr. Vinson for a follow-up appointment.

Doc. 7-9 at 6–8.  His breathing was unlabored.  Doc. 7-9 at 8.  Dr. Vinson performed a revision cordotomy to remove granulated tissue.  Doc. 7-9 at 11–12.

On March 20, 2020, Dillard saw his endocrinologist, Dr. Prelipcean, for a telehealth visit for his thyroid issues.  Doc. 7-13 at 38.  His voice sounded fine on the telephone, and he had no shortness of breath and was breathing "ok"; Dillard reported that his energy level was "ok," and that he had been "doing a lot of yardwork" but was congested.  Doc. 7-13 at 38.  Dillard was not having any thyroid problems.  Doc. 7-13 at 38.  Dr. Prelipcean noted that Dillard sounded "much better on the phone" and had "not had any more shortness of breath."  Doc. 7-13 at 39.

On June 10, 2020, Dillard saw Dr. Prelipcean for his thyroid issues.  Doc. 7-12 at 20.  Dr. Prelipcean noted that Dillard's voice was "raspy but better" and that his breathing was baseline; it had been better after surgery but was "now back to exertional" shortness of breath.  Doc. 7-12 at 20.  Dr. Prelipcean noted that Dillard had gained 20 pounds and was less active; he had no choking.  Doc. 7-12 at 20.  He appeared clinically euthyroid.  Doc. 7-12 at 21.  Dillard had an above normal BMI and was instructed to follow a daily exercise plan and low calorie diet.  Doc. 7-12 at 21.

On September 17, 2020, Dillard saw Dr. Han for an annual exam.  Doc. 7-12 at 15; Doc. 7-14 at 14.  Dillard was tolerating his thyroid medications well, had no change in symptoms, and was "stable."  Doc. 7-12 at 15.  Dillard complained of

fatigue.  Doc. 7-12 at 15.  He had a higher than normal BMI and was instructed to follow an exercise program and low calorie diet; he also was directed to exercise to combat prehypertension.  Doc. 7-14 at 16.  Dr. Han noted that there had "been no other interval hospitalizations, surgeries or emergency room visits" and "no other focal complaints at this time."  Doc. 7-12 at 15.  Dillard did not have dyspnea or chest pain.  Doc. 7-12 at 16.  His ENMT exam was normal.  Doc. 7-12 at 16.

On October 12, 2020, Dillard saw Dr. Prelipcean for his thyroid conditions; he had vocal cord paresis and hoarseness, but had no choking or breathing problems.  Doc. 7-12 at 11.  Dillard was planning to make an appointment with Dr. Vinson at Vanderbilt.  Doc. 7-12 at 11.  He appeared clinically euthyroid.  Doc. 7-12 at 12.

On October 15, 2020, Dillard saw Dr. Prelipcean for a thyroid levels check and appeared to be clinically euthyroid.  Doc. 7-12 at 10.

On January 4, 2021, Dr. Richard Snow noted that he had seen Dillard for sleep apnea, and that Dillard's CPAP machine had been retitrated, in part to account for the fact that he had gained 50 pounds.  Doc. 7-12 at 31.  Dr. Snow noted that Dillard had stridor both while awake and asleep that did not resolve while using his CPAP machine.  Doc. 7-12 at 31–32.

On January 11, 2021, Dillard's wife, Crystal Dillard, filled out a third-party function report.  Doc. 7-7 at 13–18.  Crystal stated that Dillard's life had "changed drastically" since his thyroidectomy resulted in vocal cord paralysis, and that Dillard

could no longer perform household tasks or maintain employment because his breathing was so limited and he could not engage in any physical exertion.  Doc. 7-7 at 13.  Crystal stated that Dillard took their son to school and assisted with childcare and could do limited household tasks like laundry for a short period of time.  Doc. 7-7 at 14.  She stated that she and their son helped with household tasks, that Dillard could not walk more than a few feet without "gasping for air," and that Dillard could no longer do things like mow the lawn or do manual tasks around the home.  Doc. 7-7 at 14.  She stated that Dillard could only run errands or shop for a few minutes.  Doc. 7-7 at 14.  She stated that Dillard always had used a CPAP machine but after his injury he started gasping for air in his sleep.  Doc. 7-7 at 14.  She stated that Dillard had to do self-care slowly and could no longer walk or exercise.  Doc. 7-7 at 14.

Crystal stated that Dillard cooks their meals daily, but that he has to sit down to catch his breath.  Doc. 7-7 at 15.  She stated that he could do laundry and dishes, but could not clean the house or perform household repairs or mow the lawn.  Doc. 7-7 at 15.  Crystal stated that Dillard could shop for groceries—though it took him a long time because he had to go slow and rest—and he could handle money.  Doc. 7-7 at 16.  She stated that Dillard could no longer participate in physical activities.  Doc. 7-7 at 17.  Crystal stated that Dillard's impairments affected his ability to lift, walk, talk, climb stairs, and complete tasks, and that he could not lift more than 20

12

pounds, walk more than a few feet at a regular pace, talk for long, or climb stairs. Doc. 7-7- at 18.

Also on January 11, 2021, Dillard filled out his own adult function report. Doc. 7-7 at 25–32. Dillard stated that he had trouble breathing, was not able to walk without taking breaks, and could no longer do yardwork. Doc. 7-7 at 25. Dillard stated that on a typical day he would get his son ready for school, take his son to school, do some housework (but not too much because it would make him tired the next day), pick up his son from school, get supper ready, shower, and get ready for bed. Doc. 7-7 at 26. Dillard stated that, with the help of his wife and son, he took care of their dog. Doc. 7-7 at 26. He stated that he used a CPAP machine and that he had no issues with personal care. Doc. 7-7- at 26. He stated that he had no problem cooking meals daily, though he had to watch what he ate because he choked easily. Doc. 7-7 at 27. He stated that he was able to do chores, including cleaning, laundry, vacuuming, and small home repairs, as long as he could take breaks to rest. Doc. 7-7 at 27. He stated that he had to hire someone to do yardwork because doing yardwork resulted in his being unable to do anything the next day. Doc. 7-7 at 27. He stated that he was able to shop in stores for groceries and cleaning supplies about once per week. Doc. 7-7 at 28. He stated that he had previously golfed but had to quit. Doc. 7-7 at 29. Dillard stated that his impairments affected his ability to lift, squat, bend, reach, walk, sit, kneel, talk, climb stairs, and complete tasks. Doc. 7-7

at 30.  He stated that he got winded walking to the mailbox and back, that he had trouble talking, and that he had trouble climbing stairs and lifting objects due to his breathing.  Doc. 7-7 at 30.  He stated that he could walk about 20 yards before needing to stop and rest for 5 to 10 minutes.  Doc. 7-7 at 30.

On April 14, 2021, Dillard saw Dr. Prelipcean for management of his thyroid conditions.  Doc. 7-16 at 20.  Dillard had gained 10 pounds.  Doc. 7-16 at 20.  He had hoarseness but Dr. Prelipcean noted that he "talk[ed] fine" and had "stable" breathing.  Doc. 7-16 at 20.  His BMI remained above normal and he was instructed to exercise and diet.  Doc. 7-16 at 21. Dillard appeared clinically euthyroid.  Doc. 7-16 at 21.  Dr. Prelipcean noted that Dillard sounded much better and had not had any more shortness of breath.  Doc. 7-16 at 22.

On June 23, 2021, Dillard underwent a disability assessment at Bear Creek Family Practice LLC with Dr. Mohammad Aryanpure.  Doc. 7-13 at 44–51. Dillard's range of motion, dexterity, and grip strength were normal.  Doc. 7-13 at 45–47.  On examination, Dillard denied fatigue but admitted hoarseness and shortness of breath.  Doc. 7-13 at 48–49.  Dillard stated that he had undergone multiple surgeries to help correct his vocal cords but "it did not help."  Doc. 7-13 at 48.  Dillard's ENMT exam was normal.  Doc. 7-13 at 49–50.  Otherwise, Dillard's exam was generally normal.  Doc. 7-13 at 48–51.

On September 21, 2021, Dillard saw Dr. Han for an annual physical.  Doc. 7-

14

14 at 8.  Dr. Han noted that, regarding his history of thyroid issues, Dillard was stable, was compliant with his medication, and was tolerating his medication well without any change in symptoms.  Doc. 7-14 at 8.  He had no dyspnea.  Doc. 7-14 at 9.  An ENMT exam was normal.  Doc. 7-14 at 9.  Dillard reported fatigue and had an above normal BMI for which an exercise program and diet were recommended.  Doc. 7-14 at 8, 10.  Dillard was advised to continue to work on his diet.  Doc. 7-14 at 10.  Dr. Han noted that Dillard had had no "other interval hospitalizations, surgeries, or emergency room visits," and had "no other focal complaints at this time."  Doc. 7-14 at 8.

On October 20, 2021, Dillard saw Dr. Prelipcean for management of his thyroid medications.  Doc. 7-16 at 8.  Dillard's weight was stable.  Doc. 7-16 at 8.  His voice was "baseline," but he reported that he felt like his breathing was "a little worse, similar to prior to surgery," and he stated that he intended to seek further treatment at Vanderbilt.  Doc. 7-16 at 8.  His BMI was above normal and he was instructed to follow a daily exercise program and diet.  Doc. 7-16 at 10.  Dillard was euthyroid.  Doc. 7-16 at 10.

On November 22, 2021, Dr. Prelipcean filled out a medical source statement in which she stated that Dillard had diagnoses of hypothyroidism, vocal cord paralysis, and hypocalcemia.  Doc. 7-16 at 55.  Dr. Prelipcean checked boxes— without further explanation—that Dillard would not be able to sustain an 8-hour

workday in a competitive environment and would miss 5 or more days of work per month as a result of his impairments.  Doc. 7-16 at 55.

On December 9, 2021, Dillard saw Dr. Vinson for a follow-up appointment. Doc. 7-16 at 42; Doc. 7-17 at 10.  Dillard reported that he felt that "his breathing has gradually worsened over the past year."  Doc. 7-16 at 42.  Dillard stated that he had felt "well for about a year after his last surgery," but that he had increased dyspnea with movement which had been "stable over some months," and that he was barely able to walk to the mailbox.  Doc. 7-16 at 42.  Dillard reported gaining 50 pounds in the last 2 years and believed that the weight gain might be related to his dyspnea. Doc. 7-16 at 42.  Dillard had moderate roughness of his voice and stridor at rest, but no "retractions or air hunger."  Doc. 7-16 at 42.  Dr. Vinson scoped Dillard's throat and noted bilateral vocal fold immobility and limited glottic airway.  Doc. 7-16 at 43. Dr. Vinson discussed options for treatment with Dillard, who said he wanted to try another cordotomy before undergoing a tracheotomy.  Doc. 7-16 at 44.

On January 6, 2022, Dillard saw Dr. Han for a telehealth visit with sinus congestion, sinus pressure, and cough; he did not have dyspnea or chest pain.  Doc. 7-14 at 7.  He was diagnosed with an upper respiratory infection and treated with antibiotics.  Doc. 7-14 at 7.

On June 21, 2022, Dr. Vinson filled out a medical source statement in which she checked boxes showing that Dillard suffered from vocal paralysis, obstructed

airway, shortness of breath, and weight gain (though not fatigue), that he was not able to sustain an 8-hour workday in a competitive work environment, would miss "five days or more" of work per month due to his impairment, and that his impairments had been present since September 2019. Doc. 7-3 at 15.

### B.   Social Security proceedings

#### 1.   Initial application and denial of benefits

On July 28, 2020, Dillard filed an application for disability insurance benefits alleging disability due to obesity and thyroid gland disorders with an onset date of September 1, 2017. Doc. 7-4 at 2. On July 1, 2021, Dillard's application was denied at the initial level based on a finding that Dillard did not have severe limitations and could stand or walk for about 6 hours in an 8-hour workday. Doc. 7-4 at 2–8; Doc. 7-5 at 9–12.

On July 8, 2021, Dillard requested reconsideration of the initial denial. Doc. 7-4 at 9; Doc. 7-5 at 18. On August 27, 2021, Dillard's application was denied at the reconsideration level based on a finding that he could do medium work. Doc. 7-4 at 9–16; Doc. 7-5 at 20–23.

On August 31, 2021, Dillard requested a hearing before an ALJ. Doc. 7-5 at 29–30.

#### 2.   ALJ hearing

On April 14, 2022, the ALJ conducted a telephonic hearing on Dillard's

application for benefits. Doc. 7-3 at 33–35. The ALJ noted that the record would remain open for a brief period after the hearing because Dillard was trying to obtain medical records for a November 2021 doctor's visit. Doc. 7-3 at 37.

Dillard's counsel noted that Dillard was amending his onset date to September 26, 2019. Doc. 7-3 at 38. Dillard's counsel also provided an opening statement summarizing Dillard's position, noting that Dillard had a 33-year work record, but had severe impairments of hyperparathyroidism, vocal paralysis and scar tissue that impaired his ability to speak, and shortness of breath due to issues in his throat, as well as hypocalcemia, fatigue, and obesity. Doc. 7-3 at 39.

Dillard testified that he had previously worked in machine maintenance and as an oiler greaser. Doc. 7-3 at 40–41. Dillard testified that, since his thyroid surgery, he had trouble breathing and trouble speaking, and that he could not walk far and had to sit down to catch his breath. Doc. 7-3 at 42. He testified that his vocal cords were paralyzed when his thyroid was removed, so he had to take deep breaths to talk. Doc. 7-3 at 42. Dillard testified that he could not do any yardwork or play with his 10-year-old child because he must sit for long periods of time to rest and catch his breath. Doc. 7-3 at 42. He testified that he was always tired, was "not able to get enough breath in," had to take medication every day, and had gained quite a bit of weight since his surgery because he was "not able to do anything." Doc. 7-3 at 43. Dillard testified that, on an average day, he gets up, gets his son ready for

18

school, takes his son to school, comes home, sits down to "rest a little bit," and "might try" to do laundry or "dust, whatever," with breaks to sit down and rest. Doc. 7-3 at 43. Dillard testified that, if he was not doing anything strenuous, he could stand for about 10 to 15 minutes, then had to sit down for about 10 to 15 minutes to catch his breath, but he could only do "heavy" activity for a few minutes before needing to sit down. Doc. 7-3 at 44. He stated that he had the same symptoms every day. Doc. 7-3 at 44.

Dillard testified that he lived with his wife and son and was able to drive and run errands and go to the grocery store, but had to "walk real slow pushing the cart" and had to sit down and rest for about 15 minutes after pushing the cart to his car and unloading the groceries. Doc. 7-3 at 44–45. Dillard testified that he was able to handle personal care by himself, that he did not have side effects from his medication, and that he did not have trouble sleeping. Doc. 7-3 at 45. Dillard testified that his main disabling condition was "breathing," specifically, "[t]rying to get enough air in so I can do my daily whatever I need to do," but that he did not have a lung problem. Doc. 7-3 at 45. He stated that he saw Dr. Prelipcean for his thyroid problems and Dr. Vinson for his vocal cord issues, and that neither doctor could do anything to improve his condition. Doc. 7-3 at 46. Dillard stated that the last time he saw Dr. Vinson she scoped his throat and said "everything looked fine" and had not gotten worse. Doc. 7-3 at 47. Dillard testified that he had no issues

with sitting in a chair throughout the day.  Doc. 7-3 at 47.  He testified that something like picking up a vacuum or clothes hamper can make him lose his breath.  Doc. 7-3 at 47.  He stated that his wife and son help make sure everything gets done.  Doc. 7-3 at 48.  Dillard testified that he had not worked since 2017.  Doc. 7-3 at 48.

Vocational Expert (VE) Lynn Jones then testified that a hypothetical individual with Dillard's age, education, work experience, and RFC (residual functional capacity) would not be able to perform Dillard's past relevant work.  Doc. 7-3 at 49–50.  However, VE Jones testified that such a hypothetical individual with the limitations posed by the ALJ could perform jobs classified as light work that existed in significant numbers in the national economy.  Doc. 7-3 at 50–52.  VE Jones testified that no jobs existed at the sedentary level that such a hypothetical individual could perform.  Doc. 7-3 at 52.  VE Jones testified that an individual could not miss two or more days of work per month and remain employed.  Doc. 7-3 at 54.

### 3.    ALJ decision

On May 4, 2022, the ALJ entered an unfavorable decision.  Doc. 7-3 at 16–28.  The ALJ found that Dillard "has not been under a disability within the meaning of the Social Security Act from September 26, 2019, through the date of this decision."  Doc. 7-3 at 20.

In the decision, the ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 404.1520(a); *Winschel*, 631 F.3d at 1178).  Doc. 7-3 at 20–21.  The ALJ

20

found that Dillard met the insured status requirements through December 31, 2022, and had not engaged in substantial gainful activity since September 26, 2019, the amended alleged onset date.  Doc. 7-3 at 21–22.  The ALJ found that Dillard had severe impairments of "obesity and hypothyroidism with thyroidectomy causing vocal cord paralysis."  Doc. 7-3 at 22.  The ALJ also found that Dillard suffered from non-severe sleep apnea.  Doc. 7-3 at 22.  The ALJ determined that Dillard did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 7-3 at 23.

The ALJ determined Dillard's RFC, finding that Dillard had the capacity to perform "light work" as defined in the applicable regulations,[2] except that Dillard could only occasionally climb ramps; could not climb ladders, ropes, or scaffolds; could have no more than occasional verbal communications in a job in which verbal communications were not an essential part of job duties; and had to avoid concentrated exposure to pulmonary irritants such as dust, fumes, odors, gases, poor ventilation, and chemicals.  Doc. 7-3 at 22–23.

---

[2] Pursuant to the applicable regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b).

In making the RFC finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," according to the requirements of 20 C.F.R. § 404.1529 and SSR (Social Security Ruling) 16-3p.  Doc. 7-3 at 23.  The ALJ also stated that the ALJ had considered the medical opinions and prior administrative medical findings.  Doc. 7-3 at 23.

In assessing Dillard's RFC and the extent to which Dillard's symptoms limited his function, the ALJ's decision stated that the ALJ "must follow" the required "two-step process":  (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Doc. 7-3 at 23.

The ALJ stated that Dillard alleged an inability to work due to vocal cord issues after his vocal cords were paralyzed as a result of a thyroid surgery.  Doc. 7-3 at 23.  The ALJ summarized Dillard's testimony that his vocal cord issues limited his activities because he is always tired, that he got his son ready and took his son to school in the mornings but then had to rest when he got home, that he could sit for 10 to 15 minutes and stand for 10 to 15 minutes at a time, that he was able to drive

and run errands but had to walk very slowly at the store, and that he had to rest after pushing the cart or unloading groceries.  Doc. 7-3 at 23.  The ALJ stated that Dillard alleged that his main issue was that he could not get enough air, although the condition was not due to a lung issue.  Doc. 7-3 at 23.

The ALJ found that Dillard's "statements concerning the intensity, persistence, and limiting effects of the severe impairment(s) is/are not consistent with the objective medical evidence."  Doc. 7-3 at 23.  The ALJ found that Dillard alleged "debilitating symptomatology and limitations, yet the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment."  Doc. 7-3 at 23.  The ALJ found that Dillard's description of his symptoms and limitations throughout the record had "generally been inconsistent and unpersuasive," and that, while it would be reasonable for Dillard to "experience some symptoms that would cause some exertional and non-exertional limitations, the objective medical evidence does not support a finding of disability."  Doc. 7-3 at 23.

The ALJ then found that Dillard had a thyroidectomy in October 2018, which caused vocal cord paralysis due to a recurrent laryngeal nerve injury.  Doc. 7-3 at 23.  The ALJ found that the injury caused "some hoarseness and paresis," and Dillard underwent a right partial cordotomy in November 2019 for his vocal cord paralysis.  Doc. 7-3 at 23.  The ALJ found that Dillard presented to the hospital a week later

with difficulty breathing, was treated with steroids, and improved.  Doc. 7-3 at 23–24.  The ALJ found that, when Dillard saw Dr. Vinson for a follow-up appointment in December 2019, he had stable breathing, generally normal findings other than some granulation at the surgery site and mild hypoparathyroidism, and was tolerating his medication well.  Doc. 7-3 at 24.

The ALJ found that, through September 2020, Dillard had "no further hospitalization, surgeries, or emergency room visits, and no other focal complaints," and records from regular follow-up appointments with Dr. Prelipcean and Dr. Han did not show disabling limitations or symptoms.  Doc. 7-3 at 24.  The ALJ found that Dillard mainly complained of fatigue and had mild post-hypoparathyroidism, but was doing well on his medication, had normal ENMT examinations, and his hypothyroidism was stable.  Doc. 7-3 at 24.  The ALJ found that Dillard had sinus issues in January 2022, but that those issues were due to an upper respiratory infection.  Doc. 7-3 at 24.

The ALJ found that in June 2021 Dillard had a consultative examination with Dr. Aryanpure that was normal and had a normal pulmonary function test; the ALJ found that Dr. Aryanpure did not give a medical opinion under the applicable rules.  Doc. 7-3 at 24.  The ALJ found that Dillard saw Dr. Vinson in December 2021 with breathing that had gradually worsened over the prior year and that was worse with movement, such that he reported that he was barely able to walk and had gained 50

24

pounds; he had stridor and limited glottic airway.  Doc. 7-3 at 24.  The ALJ found

that Dillard chose to undergo a left cordotomy.  Doc. 7-3 at 24.  The ALJ found that,

"although [Dillard] reported to Dr. Vinson that his symptoms had worsened over the

year, a review of Dr. Prelipcean's and Dr. Han's treatment notes over that past year

is devoid of any complaints of worsening breathing," and their notes indicated

normal exams with fatigue that could have been "due to the CPAP and significant

weight gain."  Doc. 7-3 at 24.  The ALJ found that Dillard "was able to talk and

communicate at the hearing."  Doc. 7-3 at 24.

The ALJ found that Dr. Prelipcean opined that Dillard would miss 5 or more

days of work per month due to his impairments.  Doc. 7-3 at 24.  The ALJ then found

that Dillard qualified as obese, and that—as set forth in SSR 19-2p—obesity could

combine with other impairments and cause additional pain and limitation, including

causing fatigue that could affect ability to sustain work activity, especially in cases

like Dillard's involving sleep apnea.  Doc. 7-3 at 25.  The ALJ found that Dillard's

obesity did not prevent ambulation, reaching, or orthopedic and postural maneuvers,

and did not prevent Dillard from working or being able to complete a full range of

activities of daily living.  Doc. 7-3 at 25.  The ALJ found that Dillard's obesity and

other impairments did warrant a reduction to light work with additional restrictions,

but did not rise to the level of disability.  Doc. 7-3 at 25.

The ALJ found the assessments of the state agency consultants "partially

persuasive," as they were not entirely consistent with or supported by the evidence at the hearing level, which showed that Dillard had greater limitations than opined by the consultants.  Doc. 7-3 at 25.

The ALJ found that Dr. Prelipcean's opinion was "not persuasive because it is not consistent with or supported by the evidence showing [Dillard] is stable and doing well with little [sic] issues," and because Dillard "has not had any further hospitalization, surgeries, or emergency room visits, and no other focal complaints, and his ENMT examination[s] have all been normal."  Doc. 7-3 at 25.

The ALJ then summarized the function reports from Dillard and his wife, which showed that Dillard had no difficulty with personal care, cares for animals and children, cooks meals, can do chores, and can drive and go shopping, but cannot do yardwork, and no longer golfs.  Doc. 7-3 at 25.

The ALJ found that, "[a]fter assessing [Dillard's] subjective allegations in light of the regulatory factors" and the evidence, Dillard's impairments of prehypertension, CPAP, and symptoms of fatigue would limit him to light work in order to limit heavy lifting and carrying and prolonged standing and walking.  Doc. 7-3 at 26.  The ALJ found that, due to Dillard's vocal cord issues, he could only occasionally verbally communicate and should avoid pulmonary irritants.  Doc. 7-3 at 26.

The ALJ found that Dillard was unable to perform his past relevant work as

an oiler greaser.  Doc. 7-3 at 26–27.  The ALJ then found that, considering Dillard's age, education, work experience, and RFC, along with the testimony of the VE, there existed jobs in significant numbers in the national economy that Dillard could perform, including jobs such a garment sorter, marker, and photocopy machine operator.  Doc. 7-3 at 27.  Accordingly, the ALJ found that Dillard had not been disabled, as defined in the Social Security Act, from September 26, 2019 (the amended alleged onset date), through the date of the decision.  Doc. 7-3 at 28.

### 4.    Appeals Council decision

Dillard requested that the SSA Appeals Council review the ALJ's decision.  Doc. 7-3 at 2; Doc. 7-7 at 63–65.  Dillard submitted additional evidence to the Appeals Council consisting of the medical source statement from Dr. Vinson dated June 21, 2022.  Doc. 7-3 at 15; *see* Doc. 7-7 at 63.  Dr. Vinson stated that Dillard had diagnoses of bilateral vocal fold paralysis and stenosis of the larynx, that he had symptoms of vocal paralysis, obstructed airway, shortness of breath, and weight gain (but not fatigue or limited speech), and that he could not sustain an 8-hour workday in a competitive environment, would miss 5 days or more of work per month as a result of his impairment, and had suffered those impairments since around September 2019.  Doc. 7-3 at 15.

On December 19, 2022, the Appeals Council denied Dillard's request for review of the ALJ's May 4, 2022 decision, finding no reason to review the ALJ's

decision.  Doc. 7-3 at 2–6.  The Appeals Council did not exhibit Dillard's additional evidence from Dr. Vinson, finding that the evidence did not "show a reasonable probability that it would change the outcome of the decision."  Doc. 7-3 at 3. Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

**I.     The ALJ evaluated the opinion of Dillard's treating physician Dr. Prelipcean according to the proper legal standards, and substantial evidence supported the ALJ's decision to find that Dr. Prelipcean's opinion was not persuasive.**

The ALJ evaluated the opinion of Dr. Prelipcean according to the proper legal standards, and the ALJ's decision to find that Dr. Prelipcean's opinion was not persuasive was supported by substantial evidence.  In his briefing, Dillard argues that the ALJ erred in finding Dr. Prelipcean's opinion not persuasive because the ALJ did not sufficiently address the consistency and supportability of the opinion, but rather relied on "vague generalities."  Doc. 10 at 10–12.  Dillard also argues that, contrary to the ALJ's finding that Dillard was doing well and had few issues, the record supports and is consistent with Dr. Prelipcean's opinion of more severe limitations.  Doc. 10 at 12–14.  However, the ALJ's decision shows that the ALJ

properly considered Dr. Prelipcean's opinion, and that substantial evidence supported the ALJ's finding that the opinion was not persuasive.

The SSA has revised its regulations on the consideration of medical opinions for all claims filed on or after March 27, 2017—like the claim in this case. Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating or examining physician. 20 C.F.R. § 404.1520c(a). And the Eleventh Circuit has found that the SSA's new regulations validly abrogated the so-called "treating-physician rule," such that an ALJ no longer is required to defer to the medical opinion of a treating physician. *See Harner v. Social Sec. Admin., Comm'r*, 38 F.4th 892 (11th Cir. 2022).

Instead, the ALJ considers the persuasiveness of a medical opinion according to the following five factors: (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors. 20 C.F.R. § 404.1520c(b)(2).

"Supportability" requires an ALJ to consider that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  "Consistency" requires an ALJ to consider that "[t]he more consistent a medical opinion[] or prior administrative medical finding[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] or prior administrative medical finding[] will be."  20 C.F.R. § 404.1520c(c)(2).  The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R. § 404.1520c(b)(2).

Moreover, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled."  20 C.F.R. § 404.1527(d)(1).  That is because opinions about whether a claimant is disabled, the claimant's "residual functional capacity" (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  Any such statement from a treating physician may be relevant to the ALJ's findings but is not determinative, because it is the ALJ who must find the claimant's RFC.  *See, e.g.*, 20 C.F.R. § 404.1546(c).

Here, the ALJ's decision shows that the ALJ properly applied the new, revised regulations and considered and explained the lack of supportability and consistency in Dr. Prelipcean's opinion.  Dr. Prelipcean opined, through checked boxes and without explanation, that Dillard would not be able to sustain an 8-hour workday in a competitive environment and would miss 5 or more days of work per month as a result of his impairments.  Doc. 7-16 at 55.

According to the applicable regulations, the ALJ had to consider and explain the supportability and consistency of Dr. Prelipcean's opinion.   20 C.F.R. § 404.1520c(b)(2).  Here, the ALJ explicitly found that Dr. Prelipcean's opinion was "not consistent with or supported by the evidence showing [Dillard] is stable and doing well with little [sic] issues."  Doc. 7-3 at 25.  The ALJ then found further that Dillard had not had any further hospitalizations, surgeries, emergency room visits, or other focal complaints, and that his ENMT examinations had all been normal. Doc. 7-3 at 25.

Other parts of the ALJ's decision demonstrate further the ALJ's supportability and consistency analysis.  *See, e.g., Agan v. Kijakaz*, No. 4:22-CV-00368-RDP, 2023 WL 5193468, at *9 (N.D. Ala. Aug. 11, 2023) ("An ALJ may refer to evidence discussed elsewhere in the decision when evaluating medical opinions or prior administrative findings.").  Earlier in the decision (when assessing Dillard's RFC), the ALJ found that records of Dillard's appointments with Dr. Prelipcean showed

31

"no disabling limitations or symptoms," and that—while he suffered from a main complaint of fatigue and mild post-hypoparathyroidism—Dillard was doing well on his medication and remained stable.  Doc. 7-3 at 24.  The ALJ also found that records from Dr. Vinson, Dr. Han, and consultative examiner, Dr. Aryanpure, all showed relatively normal examinations without disabling limitations or symptoms.  Doc. 7-3 at 24.  Accordingly, the ALJ's decision shows that the ALJ considered the record and found that Dr. Prelipcean's opinion was neither supported by her own treatment notes nor consistent with the record as a whole.  Therefore, the ALJ properly considered and explained the supportability and consistency of Dr. Prelipcean's opinion in accordance with the applicable regulations.  *See* 20 C.F.R. § 404.1520c(b)(2).  Moreover, the ALJ did not simply rely on "vague generalities" (*see* Doc. 10 at 10), but pointed to specific record evidence that did not support and was inconsistent with Dr. Prelipcean's opinion.

In addition, substantial evidence supported the ALJ's finding that Dr. Prelipcean's opinion was not supported by or consistent with the record.  As an initial matter, Dr. Prelipcean's opinion only contained checked boxes on severe limitations without any factual explanation for the basis of those limitations.  *See* Doc. 7-16 at 55.  The Eleventh Circuit has rejected the idea that check-box opinions from treating sources should be discounted as conclusory *solely* because of the formatting, but instead has held that the opinions should be considered in light of prior treatment

notes. *Schink v. Commissioner of Soc. Sec.*, 935 F.3d 1245, 1262 (11th Cir. 2019). Here, the extreme limitations in Dr. Prelipcean's check-box opinions are not supported by her treatment notes for Dillard.  Rather (as discussed above), her treatment notes show little basis for extreme limitation.

Dillard stated that his primary difficulty in being able to work was his breathing (*see* Doc. 7-3 at 45), but on multiple occasions Dr. Prelipcean noted in her records that Dillard's voice and breathing were okay and that he did not have shortness of breath or breathing problems.  Doc. 7-13 at 38–39; Doc. 7-12 at 11; Doc. 7-16 at 20, 22.  At one visit, Dillard actually reported that he had okay energy and had been doing yardwork.  Doc. 7-13 at 38.  Dr. Prelipcean routinely found Dillard to be euthyroid, and Dillard generally had normal examinations during his appointments with Dr. Prelipcean in which she noted that he had an above normal BMI and should follow an exercise plan and diet.  *See* Doc. 7-12 at 10–11, 20–21, 27; Doc. 7-12 at 10, 12; Doc. 7-13 at 38; Doc. 7-16 at 8, 10, 20–22.  In short, Dr. Prelipcean's treatment records suggest that Dillard was relatively stable and doing relatively well; therefore, substantial evidence supported the finding that Dr. Prelipcean's records do not show adequate support for an opinion that Dillard's impairments were so extreme that he could not complete an 8-hour workday and would miss 5 or more days of work per month.

While this court cannot "reweigh the evidence" (*Winschel*, 631 F.3d at 1178),

the rest of the record also is inconsistent with such extreme limitation.  The one time that Dillard presented to the emergency room with difficulty breathing, it was shortly after surgery and he was diagnosed with edema around his surgical site and improved upon treatment with steroids.  Doc. 7-8 at 10–16, 44.  The record does not show any other need for emergent treatment of Dillard's impairments.  After his cordotomies with Dr. Vinson, Dillard routinely had normal annual exams with Dr. Han in which he was "stable," had no shortness of breath, and had no "other focal complaints." Doc. 7-12 at 15–16; Doc. 7-14 at 8–10.  Like Dr. Prelipcean, Dr. Han consistently advised Dillard to follow an exercise program.  Doc. 7-12 at 15; Doc. 7-14 at 16, 21. Dillard saw Dr. Han in January 2022 for sinus issues, after reporting to Dr. Vinson that his breathing had worsened, but he did not report shortness of breath and the record does not show any serious issues.  Doc. 7-14 at 7.  During his visits with Dr. Vinson, Dillard reported at times that his breathing had improved, and Dr. Vinson noted that Dillard was breathing "well" and that his breathing was "unlabored."  Doc. 7-9 at 8–9.  Dillard reported shortness of breath during his examination with Dr. Aryanpure, but otherwise the examination was normal.  Doc. 7-13 at 44–51.  This record evidence is not consistent with severely debilitating impairments. Additionally, the record contains evidence from Dillard and from his wife that Dillard was capable of doing some household errands and chores.  *See* Doc. 7-7 at 13–18, 25–32.

In sum, the record contains ample evidence of relatively normal examinations and activities that are not consistent with the extreme limitations in Dr. Prelipcean's opinion and that support the ALJ's finding.  As such, a "reasonable person would accept" the evidence as "adequate to support [the] conclusion" that Dr. Prelipcean's opinion was not supported by or consistent with the evidence in the record.  *See Crawford*, 363 F.3d at 1158.  Consequently, the ALJ did not err in finding that Dr. Prelipcean's opinion was not persuasive.

## II.    The Appeals Council did not err in declining to exhibit the new evidence that Dillard submitted and in denying review of the ALJ's decision.

The Appeals Council did not err in declining to exhibit additional evidence from Dillard's treating surgeon, Dr. Vinson, and in denying review of the ALJ's decision.  Dillard argues that the Appeals Council erred by failing to accept the additional evidence from Dr. Vinson because there is a reasonable probability that Dr. Vinson's opinion would have changed the outcome of the proceedings as it was consistent with and bolstered Dr. Prelipcean's opinion.  Doc. 10 at 14–17.

"'With a few exceptions, a claimant is allowed to present new evidence at each stage of the administrative process,' including before the Appeals Council." *Washington v. Social Sec. Admin., Comm'r*, 806 F.3d 1317, 1320 (11th Cir. 2015) (quoting *Ingram v. Commissioner of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007)).  "The Appeals Council will review a case if it 'receives additional evidence that is new, material, and relates to the period on or before the date of the

hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.'"  *Pupo v. Commissioner, Soc. Sec. Admin.*, 17 F.4th 1054, 1063 (11th Cir. 2021) (quoting 20 C.F.R. § 416.1470(a)(5)); 20 C.F.R. § 404.970(a)(5).

However, the Appeals Council is not required "to provide a detailed discussion of a claimant's new evidence when denying a request for review." *Mitchell v. Commissioner, Soc. Sec. Admin.*, 771 F.3d 780, 784 (11th Cir. 2014). The Appeals Council must grant a petition for review only if it finds that the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence," including the new and material evidence. *Ingram*, 496 F.3d at 1261. When the Appeals Council denies review based on new evidence, a court reviews whether the claimant's new evidence "renders the denial of benefits erroneous." *Ingram*, 496 F.3d at 1262.

In this case, the decision of the Appeals Council does not warrant reversal because the new evidence—Dr. Vinson's opinion—did not render the denial of benefits erroneous. *See Ingram*, 496 F.3d at 1262. While Dr. Vinson's opinion is consistent with Dr. Prelipcean's opinion in that both opinions state that Dillard could not work a full 8-hour day and would miss 5 or more days of work per month (*see* Doc. 7-16 at 55; Doc. 7-3 at 15), Dr. Vinson's opinion also is unsupported and inconsistent with the record evidence—just like Dr. Prelipcean's opinion.  As

discussed above regarding Dr. Prelipcean's opinion (*see supra* Part I), Dr. Vinson's opinion contains no explanation for the severity of the limitations. *See* Doc. 7-3 at 15. Moreover, while Dr. Vinson's treatment records do show symptoms including shortness of breath (*see* Doc. 7-11 at 48–52; Doc. 7-16 at 42), they also show the following: that there were instances in which Dillard was breathing well and had unlabored breathing (Doc. 7-9 at 9; Doc. 7-11 at 50; Doc. 7-9 at 8–9), that Dillard reported feeling well for about a year after his surgery (Doc. 7-16 at 42), and that Dillard declined the more serious surgical intervention of a tracheotomy that would "certainly improve his airway" (Doc. 7-11 at 52; Doc. 7-16 at 44). Like Dr. Prelipcean's opinion, the severity of the restrictions in Dr. Vinson's opinion also is not consistent with Dillard's generally normal medical records. *See supra* Part I.

Thus, while Dr. Vinson's opinion is consistent with Dr. Prelipcean's opinion, there was no "reasonable probability" that Dr. Vinson's opinion "would change the outcome of the decision" (*Pupo*, 17 F.4th at 1063), and the opinion is not so clearly probative or determinative as to render the denial of benefits erroneous. *See Ingram*, 496 F.3d at 1262. Accordingly, the Appeals Council's denial of review of the ALJ's decision does not provide a basis for reversal.

## III.   The ALJ properly assessed Dillard's subjective testimony regarding his impairments.

The ALJ properly assessed Dillard's subjective testimony regarding his impairments. The ALJ's decision properly was based on the multi-part "pain

standard," and substantial evidence supported the ALJ's decision not to credit Dillard's subjective testimony regarding his impairments.

### A. The ALJ's decision properly was based on the multi-part "pain standard."

As a threshold matter, the ALJ's decision properly was based on the multi-part "pain standard." In his brief, Dillard argues that the ALJ improperly rejected his testimony without adequate explanation under the Eleventh Circuit's pain standard. Doc. 10 at 18–19. But the ALJ's consideration of Dillard's testimony and the record properly tracked the applicable regulations and caselaw.

When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies. That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. § 404.1529 (standard for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the

objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled."  20 C.F.R. § 404.1529(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard.  In analyzing Dillard's RFC, and the extent to which Dillard's symptoms limited his functioning, the ALJ's decision reasoned that the ALJ "must follow" the required "two-step process":  (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 7-3 at 23.  The ALJ then applied the two-part test and found that it would be reasonably expected for Dillard to "experience some symptoms that would cause some exertional and non-exertional limitations," but that Dillard's "statements concerning the intensity, persistence, and limiting effects of the severe impairment(s) is/are not consistent with the objective medical evidence."  Doc. 7-3 at 23.  Thus, the ALJ's decision was based on the proper legal standards.

### B. Substantial evidence supported the ALJ's finding regarding Dillard's subjective testimony.

Furthermore, substantial evidence supported the ALJ's decision not to entirely credit Dillard's subjective testimony.

1.       **The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.**

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.  *Wilson*, 284 F.3d at 1225.  A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms."  *Dyer*, 395 F.3d at 1210.

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."  20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective.  20 C.F.R. § 404.1529.  Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to relieve the symptoms.  *See* 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity,

40

persistence, and limiting effects of [his] symptoms." 20 C.F.R. § 404.1529(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell*, 771 F.3d at 792 (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[3] "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

---

[3] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

**2.     The ALJ properly explained the decision not to entirely credit Dillard's subjective testimony regarding his impairments, and substantial evidence supported that decision.**

The ALJ properly explained the decision to discredit Dillard's subjective testimony, and substantial evidence supported the ALJ's decision.  The ALJ made a clear and explicit finding that the ALJ did not credit Dillard's testimony about the intensity, persistence, and limiting effects of his symptoms because Dillard alleged "debilitating symptomatology and limitations, yet the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment."  Doc. 7-3 at 23.  The ALJ elaborated that Dillard's testimony had been generally "inconsistent and unpersuasive" and that the objective evidence did not support the severity of limitations alleged.  Doc. 7-3 at 23.  So, the ALJ provided the required, explicit articulation for discrediting Dillard's subjective testimony.  *See Wilson*, 284 F.3d at 1225.

In arriving at that articulation, the ALJ undertook a full consideration of the record evidence.  In assessing Dillard's RFC, the ALJ stated that the ALJ had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," according to the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p.  Doc. 7-3 at 23.  The ALJ then provided a summary of Dillard's testimony about his limitations and activities, finding that Dillard said he was always tired and had to take breaks,

but also said that he could do things like take his son to school and shop for groceries. Doc. 7-3 at 23.  The ALJ also summarized the medical evidence, including Dillard's single visit to the hospital for emergent treatment for breathing issues, his first follow-up appointment with Dr. Vinson at which he had breathing with mild audible inspiration, his lack of further hospitalizations, his relatively normal appointments with Dr. Prelipcean and Dr. Han, and his normal consultative examination with Dr. Aryanpure.  Doc. 7-3 at 23–24.  The ALJ summarized Dillard's December 2021 visit to Dr. Vinson, including Dillard's reports that his breathing had worsened over the last year, that he had increased dyspnea with movement, and that he was barely able to walk.  Doc. 7-3 at 24.  The ALJ found that Dillard chose to have another cordotomy before trying a tracheotomy, and that—while he said his breathing had worsened over the past year—records from Dr. Prelipcean and Dr. Han did not show evidence of worsening breathing.  Doc. 7-3 at 24.  The ALJ also considered the function reports from Dillard and his wife, finding that Dillard could not do yardwork or golf, but could do other activities like perform self-care, care for animals and children, cook meals, do some chores, and go shopping.  Doc. 7-3 at 25. Accordingly, the ALJ's decision considered information based on both objective and subjective evidence and identified evidence calling into doubt Dillard's subjective testimony.  *See* 20 C.F.R. § 404.1529.

Further, the ALJ did not entirely discredit Dillard's subjective testimony.  In

determining Dillard's RFC, the ALJ found that the opinions of the state agency consultants were only partially persuasive, as "the assessments are not entirely consistent with or supported by the evidence received at the hearing level that shows the claimant is more limited" than the state agency consultants opined.  Doc. 7-3 at 25.  This finding shows that the ALJ *did* credit some of Dillard's testimony about his limitations.  Moreover, the ALJ factored parts of Dillard's testimony into the RFC and explicitly found that Dillard could only do light work "in order to limit[] heavy lifting and carrying and prolonged standing and walking," had to have only occasional nonessential verbal communications "[d]ue to his vocal chord [sic] issues," and should avoid pulmonary irritants "[d]ue to his breathing issues."  Doc. 7-3 at 26.  Thus, the ALJ's RFC determination did not just discredit Dillard's subjective testimony, but rather accounted for the credible portions of Dillard's testimony regarding his impairments.

The ALJ's decision therefore includes "explicit and adequate reasons for discrediting" Dillard's subjective testimony.  *Wilson*, 284 F.3d at 1225.  The ALJ's summary of the record shows that the ALJ did not reject Dillard's testimony solely because it was not substantiated by the objective medical evidence (*see* 20 C.F.R § 404.1529(c)(2)), but instead that the ALJ considered all of the evidence, objective and subjective (*see* 20 C.F.R. § 404.1529).  The ALJ's recitation of the record also shows that the decision to discredit part of Dillard's subjective testimony was based

on the record as a whole and was not just "a broad rejection." *Dyer*, 395 F.3d at 1210.

Substantial evidence supported the ALJ's decision not to credit all of Dillard's testimony about his impairments. The record shows that Dillard only required emergent care for his breathing issues on one occasion after surgery, and that Dillard improved after being treated with steroids and undergoing a revision of scar tissue. Doc. 7-8 at 10–16, 44; Doc. 7-9 at 6–12. Dillard routinely saw Dr. Prelipcean and Dr. Han with stable condition and no emergent complaints and with either no shortness of breath or only exertional shortness of breath. Doc. 7-13 at 38–39; Doc. 7-12 at 11, 15–16, 20; Doc. 7-14 at 8–10; Doc. 7-16 at 21. Dr. Prelipcean and Dr. Han routinely recommended that Dillard follow an exercise plan and did not make any notation that he was incapable of exercise. Doc. 7-12 at 15, 21; Doc. 7-14 at 10, 16, 21; Doc. 7-16 at 10.

Dillard's testimony also shows inconsistencies. Dillard stated that he had been in good health without limitation before his thyroidectomy (Doc. 7-11 at 50), but the record shows that he presented with fatigue and exertional dyspnea before his surgery (Doc. 7-14 at 24; Doc. 7-15 at 24). Dillard stated that he could not move around or do yardwork (Doc. 7-7 at 25; Doc. 7-3 at 42), but he reported to Dr. Prelipcean in March 2020 that he had been doing a lot of yardwork and had okay energy levels (Doc. 7-13 at 38). He also told Dr. Vinson that he was doing "well"

for about a year after his surgery.  Doc. 7-16 at 42.  Although Dillard told Dr. Vinson in December 2021 that his breathing had worsened over the past year (Doc. 7-16 at 42), he did not report dyspnea when he saw Dr. Han for sinus issues in January 2022 (Doc. 7-14 at 7).  Dillard also declined to pursue the more extreme option of a tracheotomy to address his breathing issues.  Doc. 7-16 at 44.  And while Dillard stated that he was incapable of doing work, he and his wife stated in his function reports that he was able to perform his own self-care, care for his son, do some chores, run errands, and prepare dinner daily.  Doc. 7-7 at 13–16, 25–30.

Thus, the record includes sufficient facts inconsistent with the alleged severity of Dillard's limitations to support the ALJ's finding regarding Dillard's subjective testimony, as well as the ALJ's ultimate finding that Dillard was not disabled.  As explained above, substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158); and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529)).  Even if the evidence in this case were to preponderate against the Commissioner's findings, a review of the record shows that there is sufficient evidence based on which a reasonable person would accept the ALJ's findings that Dillard's testimony regarding his limitations was not consistent with the record.  *See*

*Crawford*, 363 F.3d at 1158.  Accordingly, substantial evidence supported the ALJ's decision.  Moreover, the court cannot conclude that "the ALJ was clearly wrong to discredit" Dillard's subjective testimony (*Werner*, 421 F. App'x at 939); the ALJ clearly articulated a credibility finding supported by substantial evidence, and as a result the court cannot disturb that finding.  *See Foote*, 67 F.3d at 1562.

**IV.    The ALJ did not err by failing to properly develop the record.**

The ALJ properly found Dillard's RFC based on an adequately developed record.  In briefing, Dillard argues that the ALJ erred by determining Dillard's RFC without fully and fairly developing the record because the ALJ rejected, at least in part, all of the medical opinions in the record and did not get sufficient information from consultative examinations.  Doc. 10 at 19–25.  Dillard also attached a note from Dr. Prelipcean as an exhibit to his briefing, which states in relevant part that Dillard had "bilateral paralysis of his vocal cords causing him significant problems with breathing, shortness of breath with minimal exertion, hoarseness, and swallowing," that he would possibly need "reinterventions" at Vanderbilt "down the line," and that he had "been placed on disability."  Doc. 10-1.

An ALJ "has a basic duty to develop a full and fair record."  *Henry v. Commissioner of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015).  By statute, the Commissioner must "develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is

not under a disability." 42 U.S.C. § 423(d)(5)(B).  Applicable regulations further clarify that the Commissioner has the responsibility to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant] file[s] [his] application unless there is a reason to believe that development of an earlier period is necessary or unless [the claimant] say[s] that [his] disability began less than 12 months before [he] filed [his] application."  20 C.F.R. § 404.1512(b)(1).

An ALJ also can order a consultative examination.  20 C.F.R. § 404.1512(b)(3).  The ALJ "has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision."  *Ingram*, 496 F.3d at 1269.

So, while the ALJ does have the "basic duty to develop a full and fair record" (*Henry*, 802 F.3d at 1267), the claimant ultimately "bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. § 404.1512(a) ("[I]n general, you have to prove to us that you are . . . disabled.  You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled.").  And, notwithstanding the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of

prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997).  The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Graham*, 129 F.3d at 1423 (quotation marks omitted).

Here, the record was fully and fairly developed.  The ALJ had an extensive record of Dillard's medical treatment back to as early as 2013, including records of multiple visits to Dr. Prelipcean, Dr. Han, and Dr. Vinson.  *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(b)(1); Doc. 7-9 at 9; Doc. 7-11 at 48–52; Doc. 7-13 at 38–39; Doc. 7-14 at 19, 24, 35–58; Doc. 7-15 at 13.  The record also contains the results of a consultative examination by Dr. Aryanpure, even though Dr. Aryanpure did not submit an opinion complying with the regulations.  Doc. 7-13 at 44–51.

In light of the extensive medical evidence in the record, the ALJ did not need to order a consultative examination or rely on a particular physician opinion in determining Dillard's RFC; the amount of medical evidence in the record was sufficient for the ALJ to make an informed finding regarding Dillard's RFC.  *See Ingram*, 496 F.3d at 1269.  Moreover, the "task of determining a claimant's residual functional capacity and ability to work rests with the [ALJ], not a doctor." *Moore v. Social Sec. Admin., Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016); *see also* 20

C.F.R. § 404.1546(c) ("If your case is at the [ALJ] hearing level . . . , the [ALJ] . . .
is responsible for assessing your residual functional capacity.").

Nor can Dillard make the required showing of prejudice; there could be no
fact-based argument about how a hypothetical consultative examination would have
changed the ALJ's RFC finding.  The note from Dr. Prelipcean (Doc. 10-1) does not
show prejudice as it largely restates the information already in the record.  Further,
the fact that Dr. Prelipcean stated that Dillard had been placed on disability is neither
determinative nor probative, as a determination of disability is reserved for the ALJ.
*See, e.g.*, 20 C.F.R. § 404.1546(c).   Dillard has identified no evidentiary gaps in the
record resulting in "unfairness or clear prejudice," and consequently there is no basis
for reversal due to failure to develop the record.  *See Graham*, 129 F.3d 1422–23;
Doc. 15 at 17–19.

In sum, substantial evidence supported the ALJ's RFC finding, and the ALJ's
duty to develop the record did not require the ALJ to order an additional consultative
examination.  *See Ellison*, 355 F.3d at 1276; 20 C.F.R. § 404.1512(a).

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court
**AFFIRMS** the Commissioner's decision.   The court separately will enter final

judgment.

      **DONE** and **ORDERED** this March 27, 2024.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE